IN THE UNITED STATE DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for
Century Bank, Federal Savings Bank,

     Plaintiff,

vs.

                                   CIVIL ACTION NO. _____

BARRY M. FLORESCUE,
CHARLES W. MIERSCH,
STANLEY KREITMAN,
JAMES M. NICKERSON, and
JOHN P. O'NEILL,

     Defendants.

_____/

## COMPLAINT
### And Demand for Jury Trial

     Plaintiff, Federal Deposit Insurance Company, as Receiver for Century Bank,

Federal Savings Bank, sues Defendants and alleges the following:

## I.   INTRODUCTION

     1.     On November 13, 2009, the Office of Thrift Supervision ("OTS") closed

Century Bank, Federal Savings Bank, Sarasota, Florida ("Century" or the "Bank") and

appointed the FDIC as Receiver for Century ("FDIC-R").  The loss to the Deposit

Insurance Fund as a result of the failure of Century is currently estimated at $357.0 million.

As set out in 12 U.S.C. §§ 1821(d)(2)(A) and 1823(d)(3)(A), the FDIC-R succeeded to all

rights, title, and privileges of Century and its depositors, account holders, other creditors,

and stockholders, including (but not limited to) the right to pursue claims against the

Bank's former directors and officers, including the claims asserted herein against each of the Defendants.

2.     The claims asserted herein are against five former Century directors, one of whom was also an officer, for negligence and gross negligence.  FDIC-R brings this action in its capacity as Receiver for Century and seeks compensatory and consequential damages. The wrongful acts committed by the Defendants were in connection with ten speculative and high risk transactions, including six commercial real estate ("CRE") and acquisition, development, and construction ("ADC") transactions, two residential real estate transactions, and two transactions involving the commercial financing of a speculative investment operation.  The transactions were approved by the Defendants from May 10, 2006, through April 28, 2009 (the "Transactions").   The ten Transactions are identified in Exhibit "A," which is attached hereto and incorporated herein.

3.     The Defendants failed to use safe and sound banking practices and, on an uninformed basis, approved and allowed irresponsible and unsustainable rapid asset growth concentrated in high-risk transactions, including the ten Transactions that are the subject of this action, without implementing and adhering to adequate underwriting and credit administration policies and practices to manage the risks.  Defendants routinely failed to inform themselves adequately of the relevant risks in connection with their approval of credit transactions, failed to prevent violations of the Bank's policies, ignored glaring deficiencies in transaction presentations, and instead, without meaningful deliberation, approved transactions they knew, or should have known, would likely cause substantial losses to the Bank, including the ten Transactions.

4.      As described in more detail below, there were numerous material deficiencies with respect to the ten Transactions, each of which required the approval of, and was approved by, the Defendants.  These deficiencies adversely affected the risk to the Bank and included, but were not limited to:  (1) failure to obtain, analyze, and evaluate historical borrower and guarantor financial information required to assess the creditworthiness of the borrower and guarantor as well as their respective ability to service debt and carry the projects; (2) engaging in transactions with borrowers and/or guarantors who had not demonstrated sufficient liquidity to service debt; (3) failure to evaluate collateral and other sources of repayment; (4) failure to adhere to the Bank's loan to value ("LTV") ratio limits; (5) turning a blind eye to glaring deficiencies in transaction presentation information; (6) failure to evaluate properly the underlying real estate, to consider issues raised in appraisals, or to obtain adequate appraisals; (7) engaging in transactions outside of the Bank's geographic business territory; (8) approval of transactions without obtaining full pre-funding approval; and (9) approval of transactions to borrowers of known questionable honesty.

5.      The Defendants also approved a number of the ten Transactions after it was clear that the Bank was in dire financial condition and failed to meet regulatory capital requirements.  In short, the Defendants regularly violated the Bank's policies and prudent banking standards, engaged in numerous wrongful acts and, as a direct and proximate result, caused substantial damages.

## II. JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this matter as actions in which the FDIC is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, et seq., 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.  The FDIC has the power to bring suit in any court of law.  12 U.S.C. § 1891.

7.      This Court has personal jurisdiction over the Defendants who at all relevant times were either residents of, or conducted the business of the Bank, in the State of Florida.

8.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because the claims and causes of action asserted in this Complaint arose and occurred in this district.

## III. THE PARTIES

9.      The FDIC is a corporation organized and existing under the laws of the United States of America, specifically 12 U.S.C. §1811 *et seq.*, and is an instrumentality of the United States of America charged with, among other duties, the orderly liquidation of failed banks.  12 U.S.C. §1821(d).  The FDIC brings this action as the Receiver for Century ("FDIC-R").

10.     Defendant Barry W. Florescue ("Florescue") was Century Bank's Chief Operating Officer ("COO") from 1988 until the OTS required him to relinquish that position in February 1997.  Florescue was a member of the Bank's Board of Directors from 2008 until the Bank failed.  Florescue resides in Broward County, Florida.

11.     Defendant John P. O'Neill ("O'Neill") was the President, COO, and a Bank director from April 5, 2000, until the Bank failed.  O'Neill resides in Broward County, Florida.

12.     Defendant Stanley Kreitman ("Kreitman") was a Century Bank director from 2001 until the Bank failed.  Kreitman currently resides Nassau County, New York.

13.     Defendants Charles W. Miersch ("Miersch") was a Century Bank director from 1988 and was Chairman of the Bank's Board from January 2005 until the Bank failed. From February 2007 through February 2009, Miersch also was a director of Renaissance Acquisition Corporation, which was founded by Florescue in 2007 and is now inactive. Miersch resides in Loudon County, Tennessee.

14.     James M. Nickerson ("Nickerson") was a Century Bank director from 1988 until the Bank failed.  Nickerson resides in Lake County, Indiana.

### IV.   THE DEFENDANTS' DUTIES

15.     Defendant O'Neill, as President and CEO of the Bank, owed to the Bank, its depositors, account holders, other creditors, and stockholders under Florida law, the duty to act in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Bank; to manage the Bank in a safe and sound matter, to ensure that the Bank's policies were followed, to take reasonably prudent steps to ensure that Century did not approve or engage in imprudent business transactions as part of a plan to unreasonably grow the Bank or otherwise.  O'Neill assumed the duties of an officer of Century to act in a reasonably prudent and non-negligent manner, consistent with the standard of care for

reasonable bank officers for managing a depository institution.  O'Neill was required to

exercise ordinary care and diligence in approving transactions he had authority to approve,

including the ten Transactions he approved as a member of Century's Board.

16.     All Defendants, as directors of Century, owed to the Bank, its depositors,

account holders, other creditors, and stockholders under Florida law the duty to act in good

faith, with the care an ordinarily prudent person in a like position would exercise under

similar circumstances, and in a manner they reasonably believed to be in the best interests

of the Bank; to ensure that the Bank's policies were followed and to take reasonably

prudent steps to ensure that Century did not approve or engage in imprudent business

transactions as part of a plan to unreasonably grow the Bank or otherwise; and to exercise

ordinary care and diligence in approving transactions as members of the Bank's Board,

including the ten Transactions, and in the administration of the affairs of the Bank.

## V.   FACTUAL BACKGROUND

17.     CRE and ADC Transactions, including six of the ten Transactions, are more

speculative than other bank transactions because, among other reasons, of the lack of an

inherent cash flow source, uncertainties of development and in the sales process, and the

need for adequate and secure primary and secondary sources of repayment.  Prudent action

in this segment of banking requires careful underwriting, timely evaluation of and response

to economic trends impacting the industry, and strict adherence to prudent banking policies

and standards.

18.     Moreover, concentrating a portfolio in CRE and ADC transactions increases

a bank's aggregate risk for numerous reasons, including: (a) concentration in *any* sector of

the economy increases risk resulting from that sector's downturn; (b) the housing market, in particular, is cyclical by nature; (c) the primary source of repayment is cash flow from the sale of the real estate collateral; and (d) historically, bank failure rates closely correlate with high real estate development-related CRE and ADC concentrations.

19.    In short, concentrations of such transactions in the volatile commercial real estate market render a bank vulnerable to changes in market conditions and require vigilant adherence to sound lending practices.  It is imperative that the known risks inherent in high CRE and ADC concentrations be managed by, at a minimum, stringent underwriting and adherence to internal credit policy and prudent lending standards, meaningful and informed deliberation, management oversight, strategic planning, risk assessment and monitoring of the transactions, portfolio risk management, management information systems, market analysis, and stress testing.

20.    Century opened for business on January 23, 1985, as a federally chartered savings bank.  Beginning in 2005, and to accelerate growth, the Bank accelerated its focus on large high-risk CRE transactions, including those outside of its market area.  From December 31, 2002, to December 31, 2007, Bank assets grew by 270 percent.

21.    Before approving any of the ten Transactions, Defendants knew or should have known, that the Bank was over-concentrated in risky CRE loans in as early as 2005.  At a December 15, 2005, board meeting, Florescue "expressed concern around land and hotel concentrations and the need to broaden the portfolio's risk diversification. . . . ."

22.    By no later than December 2005, and before approving any of the ten Transactions, Defendants were warned by regulators that the Bank's underwriting and loan

administration were deficient, and included statutory loan-to-value ("LTV") and loan-to-one-borrower ("LTOB") violations, along with significant appraisal exceptions. Ignoring these warnings, Defendants continued to aggressively pursue increased CRE/ADC transactions and to engage in unsafe and unsound practices, and failed to take corrective measures to diversify the Bank's portfolio. Despite these warnings, similar violations were later made in connection with many of the ten Transactions approved by the Defendants that are the subject of this case.

23.     As the Defendants knew or should have known, the Bank's asset quality deteriorated and CRE concentrations increased throughout 2006. Yet Defendants continued to approve the ten Transactions, and permitted and approved an increase in CRE concentration levels as the real estate market declined and the Bank's collateral values diminished.

24.     Beginning in the second quarter of 2006, the Bank's CRE concentration levels were in violation of the Bank's own written policy, which required that CRE credits not exceed 400 percent of the Bank's equity capital. The Bank's CRE concentration levels were at all times well above the FDIC's concentration threshold of 300 percent of capital. Although the Defendants knew or should have known of the FDIC's concentration thresholds, they failed to determine whether the Bank complied with them, and continued to approve risky CRE transactions including six of the ten Tranasctions.

25.     Despite the warnings and policy violations, the Defendants continued to aggressively pursue increased CRE/ADC transactions, including six of the ten Transactions, and failed to take corrective measures to diversify the Bank's portfolio or enhance

underwriting or risk management standards.  Despite these warnings, the Defendants continued to engage in unsafe and unsound practices.  Among other issues, the Defendants continued to allow excessive concentrations in CRE and ADC loans, including by approval of some of the ten Transactions, failed to properly approve transactions, violated Interagency Appraisal and Evaluation Guidelines for appropriate appraisals, violated the Interagency Policy Statement on the Allowance for Loan and Lease Losses ("ALLL"), and improperly relied on interest reserves as a source of repayment.

26.     The Defendants increased the Bank's already high risk exposure by: (i) failing to implement and follow sound underwriting and credit administration practices; (ii) failing to implement prudent risk management strategies; (iii) failing to follow the Bank's internal credit policies; (iv) failing to approve the ten Transactions in an informed and deliberative manner; and (v) taking actions that otherwise negatively impacted the Bank's assets.

27.     The Defendants knew or should have known that the Bank was pursuing risky growth strategies, including the approval of the ten Transactions.  They were warned by regulators about the Bank's underwriting deficiencies and increasing concentration in the CRE and ADC area and attendant risks and deficiencies, yet continued to approve such risky transactions, including some of the ten Transactions.

28.     In addition to ignoring repeated regulatory warnings, the Defendants failed to inform themselves, recognize and/or appreciate the significance of the decline of key economic indicators, such as a slowing of housing sales and peaking of home prices by

early 2006, and continued to encourage and approve high risk and speculative transactions, including the ten Transactions.

29.     Due to the deficient underwriting allowed by the Defendants in approving transactions, including the ten Transactions referenced in Exhibit A, as well as deficient risk management and poor credit administration, Century was fatally exposed to the inevitable cyclical decline in real estate values.  As real estate markets declined, the Bank's financial condition deteriorated and its condition was deemed critical.  Asset quality problems in the Bank's portfolio resulted in material losses that threatened the Bank's viability.  The Defendants failed to take necessary and timely actions to improve the Bank's financial condition, and Century failed on November 13, 2009.

## VI.   CENTURY'S INTERNAL CREDIT POLICIES AND PRACTICES

30.     During the relevant time period, the Defendants comprised the full membership of the Bank Board.  According to Bank policy, each credit transaction in excess of $2.5 million required the full Board (*i.e.*, all of the Defendants) to convene and unanimously approve each transaction prior to funding.  Each of the ten Transactions on Exhibit A exceeded $2.5 million and required full Board approval, *i.e.*, approval by all of the Defendants.  In exercising their approval authority, the Defendants were charged with acting in an informed and deliberative manner in reviewing and analyzing applications and supporting documentation to ensure that transactions were properly documented, underwritten, and otherwise satisfied the Bank's internal credit policies as well as prudent, safe, and sound, banking practices.

31.     Century's internal credit policy dated as of May 2006, as amended in

October 2007, governed the approval of the ten Transactions on Exhibit A.  At all times

relevant to this matter, the provisions of the internal credit policy set forth below were in

effect and governed the approval of the ten Transactions.  In conscious disregard for the

best interest for the Bank, the Defendants, without being fully informed, and without

meaningful deliberation, carelessly and without due care, approved the ten Transactions

before funding and violated, among other things, the following provisions of the Bank's

internal credit policy:

- "All credits must be approved prior to funding."

- The Bank was required to "minimize…high-risk" transactions.

- The Bank's CRE concentrations "shall not exceed" 400 percent of the Bank's equity capital.

- Loan to Value ("LTV") ratio limits were 75 percent for land development; 80 percent for commercial construction; and 85 percent for one- to four-family residential construction.

- Prohibited loans include loans "to people whose honesty is questionable."

- All loans "must be supported with current and sufficient financial information on the borrowers and guarantors that permits an adequate evaluation of the ability to pay."

- For new corporate borrowers, financial statements for the prior two full years and corporate tax returns are required; for new individual borrowers, a current (within 90 days) personal financial statement and two years of personal tax returns are required.

- Pre-approval appraisals must be performed by state-certified or licensed appraisers; appraisals must conform to Uniform Standards of Professional Appraisal Practice ("USPAP"); appraiser must be independent; and appraisal must be reviewed using the Bank's Appraisal Review form.

- With respect to large residential transactions:

    o Individual income should be verified either by IRS W2 Forms covering the most recent two-year period or by direct employer verification.

    o Income from self-employment should be confirmed with financial statements and tax returns of the applicant's business.

    o Loans in excess of $650,000 must be supported by two appraisals subject to Bank review and compliance with Bank appraisal policies.

32.     In addition to failing to comply with the internal credit policy in approving the ten Transactions on Exhibit A, the Defendants failed to comply with applicable banking regulations and safe and sound underwriting practices, including, but not limited to, the general safety and soundness standards of 12 C.F.R. § 364.101, Appendix A, the general underwriting standards of 12 C.F.R. § 364.101, Appendix A, and the real estate lending standards of 12 C.F.R. § 365.2, Appendix A.

33.     The Defendants' approval of the ten grossly imprudent Transactions on Exhibit A was devoid of even the slightest degree of care by them as Directors and/or, in the case of O'Neill, as an officer, and thus demonstrates the Defendants' negligence and gross negligence in performance of their duties.  The Defendants' approval of the ten Transactions on Exhibit A demonstrates their failure to exercise business judgment.

## VII.  THE TEN TRANSACTIONS

34.     The ten Transactions on Exhibit A, six of which were high risk CRE/ADC transactions, all contained multiple violations of the Bank's internal credit policy, prudent banking standards, and in some cases, violated Banking statutes and regulations, all of which adversely affected the risk profile of Century.

35.     Despite multiple material deficiencies, repeated and obvious violations of the Bank's internal credit policy, prudent banking standards, and in some cases, violations of banking statutes and regulations, each of the Defendants voted to approve at least five of the ten Transactions prior to funding.  As indicated on Exhibit A, prior to funding, O'Neil approved ten; Miersch approved nine; Florecue approved eight; Nickerson approved six; and Kreitman approved five.  After funding, all Defendants ratified approval of all ten Transactions.

36.     The manner in which the Defendants purported to approve most of the ten Transactions on Exhibit A violated the Bank's internal credit policy.  As set forth above, each Transaction required that the full Board (*i.e.*, all of the Defendants) convene and unanimously approve each transaction prior to funding.  This was designed to allow for reasoned consideration and debate.  However, typically, fewer than all five of the Defendants would verbally "approve" a loan by telephone before funding.  Then, *after* funding, each Defendant as the full Board would meet and "ratify" the "approval."  This occurred with five of the ten Transactions.  The Board, *i.e.*, the Defendants, had no authority to approve the Transactions in this manner.  Nor could the Defendants realistically exercise any degree of reasonable care or business judgment by rubber-stamping an existing approval without exercising any business judgment.

37.     In addition to other violations, all eight of the CRE/ADC and residential Transactions: were overly dependent on collateral for repayment; included a demonstrable inability of the borrowers or guarantors to service debt or carry the project, or had insufficient documentation or inadequate borrower or guarantor analysis; were approved

without adequate analysis of the viability of the proposed projects; and many lacked a sufficient supporting appraisal of collateral and were in violation of the Bank's LTV limitations.

38.     In addition to the foregoing violations, the two Transactions that funded commercial lines of business credit were made to customers of questionable honesty, were made outside of the Bank's traditional business area and expertise, and were made at a time when the Bank did not in fact have sufficient capital to support approval of the Transactions.

39.     Defendants' approval of the ADC Transaction with "BDG"[1] (the "BDG Transaction" listed on Exhibit A) is illustrative of the Defendants' abdication of their obligations to comply with the Bank's internal credit policy, to follow safe and sound banking practices, and to act in a deliberate and informed manner.

40.     On June 8, 2006, the full Board (all five Defendants) approved a $6.155 million CRE line of credit to an entity known as "BDG" for the speculative development of two residential lots in the Hamptons area of Long Island in Water Mill, New York. BDG was controlled by New York real estate investor and investment manager William Landberg ("Landberg") who was, according to Bank documents, "well known" to Florescue. As described in more detail below, Defendants Florescue and Kreitman invested in investment partnerships managed by Landberg, who has since been convicted of operating a Ponzi scheme through these partnerships.

---

[1]   Borrowers and guarantors are described using initials only in order to preserve their right to financial privacy afforded by applicable state and federal banking laws. Under a protective order, the full names will be provided to Defendants.

41.     The BDG Transaction was a 24 month interest only credit.  The primary source of repayment was an interest reserve established by the Bank, and the secondary source of repayment was to be from the sale of the developed real estate.  The sole guarantor was an individual named "R.G.," who was a principal in BDG.

42.     The development parcels, borrowers, guarantors, and all of the real estate and collateral were located well outside of the Bank's geographic business territory, which at the time was limited to the State of Florida by the Bank's internal credit policies.

43.     The Defendants approved the BDG Transaction without obtaining an appraisal of the collateral prior to approval. Once an appraisal was obtained, it was not prepared by appraiser on the Bank's approved appraiser list and it was not reviewed using the Bank's Appraisal Review form, which is designed to ensure that appraisal meet the minimum standards required by Bank policy.  The Defendants also failed to obtain or review the borrower's prior two full years of financial statements and information.

44.     Notwithstanding the continued and severe decline in the real estate market, on October 10, 2007, the Defendants approved an increase in the line of credit to $5.7 million in order for the borrower to purchase additional out-of territory New York real estate.  According to the Bank's Credit Memo, this credit facility was supposed to be reduced by $1.9 million by the sale of one of the properties pledged as collateral for the original line prior to funding the increase.  However, the reduction to the line did not occur prior to funding.

45.    Following a personal request from Landberg, on December 14, 2007, the

Defendants approved yet another increase that nearly doubled the line of credit to $10.466

million, which was funded on January 31, 2008.

46.    The BDG Transaction violated internal Bank policies and prudent lending

standards in at least the following respects:

- The Transaction was out-of-territory, as was the collateral.

- The primary source of repayment was dependent upon the consummation
  and sale of completed and speculative real estate development in a declining
  real estate market.

- There were no tax returns for new corporate borrowers.

- The financial information in the documentation provided to the Board
  reflected many deficiencies, including a lack of a detailed cash flow analysis
  sufficient to determine the borrower's and guarantor's ability to repay or
  service debt.

- There was no prefunding appraisal in connection with the initial
  transactions, and subsequent appraisals in connection with subsequent
  transactions violated Bank policy because they were outdated and not
  performed by approved appraisers.

- The BDG Transaction involved a principal whose integrity and honesty were
  questionable.

47.    A series of complex commercial transactions to finance the operations of

Landberg's New York investment funds, including the "W.E.1" and "W.E.2" Transactions

listed on Exhibit A, provide further examples of the Defendants' wrongful acts.  On August

5, 2008, while the Bank's regulatory capital was impaired, the Defendants approved a $5

million line of credit ("LOC") to "W.E.1," which was a mortgage backed investment fund

controlled by Landberg.

48.     On February 12, 2009, again while the Bank's regulatory capital was significantly impaired, the Defendants approved a second $5 million LOC to another Landberg investment partnership known as "W.E.2" (together both Transactions are referred to as the "W.E. Transactions").  The Defendants approved the W.E.2 Transaction more than four months after receiving official notice from regulators that it was critically under-capitalized.

49.     W.E.2 generated investor returns through commercial loans to restaurant franchises.  The Bank's own loan policy classified this restaurant-related credit as "undesirable."  This LOC was to have been collateralized by a pledge of W.E.2's equity interests in three other Landberg affiliates.

50.     As it turns out, these two Transactions were used to fund Landberg's Ponzi scheme.  The Defendants expressed concerns with Landberg prior to approving the W.E. Transactions, but they approved them anyway.  Landberg was pressuring the Bank to make these large and complex loans immediately and under unusual time constraints.  Both W.E. Transactions were made after the Bank's CFO and Defendant O'Neill discussed how they did not trust Landberg.  The Defendants approved the W.E.2 Transaction despite the strong misgivings of Defendant Miersch, who said: "I am not sure we should or can do this."  The Bank's CFO replied: "I do not know whether any of these complicated transactions are technically prohibited by any law or regulation, but they do not give me a real good feeling."

51.     In addition, it appears that the W.E. Transactions were approved as a quid pro quo to Landberg:  Landberg promised to invest an additional $10 million in the Bank at

around the time that the Defendants approved the W.E.1 Transaction in September of 2008. The Bank's CFO admitted that "a portion of the value of this bank depends on Landberg."

52.     Moreover, both Florescue and Kreitman had personally invested in Landberg's funds.  Proceeds of the W.E.2 Transaction were used to cure W.E.2's imminent default on its $6 million loan from Caplease, Inc.  Kreitman was a Caplease, Inc. director at the time.

53.     In short, in approving these two transactions, the Defendants gave away $10 million to Landberg, when the Bank did not have the money to lend and where Florescue and Krietman had significant funds invested with Landberg.

54.     As with the BDG and W.E. Transactions, each of the other Transactions on Exhibit A contained deficiencies that were readily identifiable to the Defendants, yet the Defendants approved the ten Transactions despite the deficiencies.

55.     In their review, evaluation, and approval of the ten Transactions, the Defendants and each of them failed, neglected, or refused to approve the transactions in an informed and deliberate manner.  The Defendants failed to exercise even the slightest care in their review, evaluation and approval of the ten Transactions, causing substantial damages.

56.     In their review, evaluation, and approval of the ten Transactions on Exhibit A, the Defendants and each of them failed, neglected, or refused to fully and properly discharge their duties and obligations, and failed, neglected, or refused to exercise that degree of diligence, care, and skill which ordinarily prudent persons would exercise under

similar circumstances in like positions and in a manner consistent with the best interests of

the Bank.

57.    With respect to the ten Transactions, each of the Defendants caused or

permitted some or all of the following acts or omissions, among others:

   a. Failing to act with meaningful deliberation and failing to inform
      themselves and each other about the true nature and condition of the
      Bank's portfolio, and failing adequately to review and inquire into the
      Bank's transactions;

   b. Failing to establish and adhere to policies and procedures that took into
      account the warnings and criticisms of the Bank by regulatory authorities
      and independent auditors, including but not limited to approving and/or
      acquiescing in the imprudent growth of the Bank's CRE/ADC
      transaction portfolios;

   c. Causing or permitting Transactions to be made to borrowers who were or
      should have been known to be not creditworthy or who demonstrated a
      lack of ability to repay;

   d. Causing or permitting Transactions to be made with inadequate or
      inaccurate financial information regarding the creditworthiness of the
      borrower/guarantors and prospective source of repayment;

   e. Approving Transactions with inadequate documentation;

   f. Causing or permitting Transactions to be made on an unsecured or
      inadequately secured basis, including but not limited to violations of
      policies and regulations pertaining to appropriate LTV ratios;

   g. Causing or permitting Transactions to take place on the basis of
      inadequate appraisals;

   h. Causing or permitting Transactions involving those with questionable
      honesty and possible conflicts of interest; and

   i. Failing generally to exercise their duties to manage and supervise the
      affairs of the Bank in a safe, sound, and prudent manner consistent with
      their duty to act in the best interests of the Bank and to protect the Bank
      and its stockholders, account holders, and depositors.

58.     In connection with the aforementioned acts and omissions related to their approval of the ten Transactions, the Defendants, individually and collectively, made uninformed decisions without meaningful deliberation and disregarded to advice of regulators and independent auditors designed to assist them in their decision-making.

59.     The Defendants' actions and inactions in approving the ten Transactions displayed such an absence of care in the exercise of their affairs as to constitute negligence and gross negligence in the performance thereof, and constitute abuses of discretion and/or demonstrations of bad faith.

60.     As early as May 10, 2006, when they approved the first of the ten Transactions, the Defendants knew or should have known of the obvious increased risk to the Bank in pursuing the growth strategy for high-risk CRE/ADC transactions. The breaches of the duties of care each Defendant owed to the Bank, its depositors, account holders, other creditors, and stockholders proximately caused the damages complained of herein.  In particular, the Defendants' negligent and grossly negligent approvals of the ten Transactions on Exhibit A caused significant damages.

61.     All conditions precedent to the bringing of this action have been satisfied or waived.

## VIII. CLAIMS FOR RELIEF

### COUNT I
### Ordinary Negligence

62.     FDIC-R realleges and incorporates by reference each of the allegations in paragraphs 1 through 61 of this Complaint as though fully set forth herein.

63.     The Defendants owed the Bank, its depositors, account holders, other creditors, and stockholders a duty of care under §607.0830(1)(a)-(c), Florida Statutes, and other provisions of Florida law to act in good faith, in a manner they reasonably believe to be in the best interests of the corporation, to exercise the diligence, care, and skill which ordinarily prudent persons would exercise under similar circumstances in like position, including, but not limited to, the following:

a. Informing themselves about each of the proposed ten Transactions and the risks of the Transactions posed to the Bank before they approved them;

b. Engaging in meaningful deliberation and exercising independent judgment in connection with the review and approval of the ten Transactions;

c. Approving only those Transactions that conformed with the Bank's internal policies;

d. Confirming that any Transactions the Defendants approved were underwritten in a safe and sound manner;

e. Ensuring that any Transactions they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

f. Not approving Transactions that exceeded the Bank's relevant concentration limits without adequate capital and other safeguards in place to mitigate the added risk of loss; and

    g.  Ensuring that any Transactions approved did not violate applicable banking rules and regulations.

64.    The Defendants breached these duties of care and were negligent by, among other things:

    a.  Failing to inform themselves about the risks that the ten Transactions that are the subject of this action, posed to the Bank before they approved them;

    b.  Failing to engage in meaningful deliberation and exercise independent judgment in connection with the review and approval of the ten Transactions;

    c.  Approving the ten Transactions, with terms that were contrary to and/or inconsistent with the Bank's internal credit policy;

    d.  Failing to confirm that the ten Transactions, were underwritten in a safe and sound manner;

    e.  Failing to ensure that the ten Transactions, were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

    f.  Approving Transactions that caused the Bank to exceed the Bank's relevant concentration limits; and

    g.  Failing to ensure that the Transactions did not violate applicable banking rules and regulations.

65.     As a direct and proximate result of the Defendants' negligent actions and omissions as described herein, the FDIC-R seeks damages caused thereby, the exact amount to be proven at trial.

66.     With respect to their negligent actions and inactions in approving the ten Transactions, the Defendants were acting in cooperation and in concert and, therefore, each Defendant is jointly and severally liable for all compensatory and other damages.

## COUNT II
### Gross Negligence Under 12 U.S.C. § 1821(k)

67.     The FDIC-R realleges and incorporates by reference each of the allegations in paragraph 1 through 61 of this Complaint as though fully set forth herein.

68.     Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law. Florida law defines "gross negligence" as the equivalent of slight care or as a course of conduct which a reasonable and prudent person would know would probably result in harm or injury.

69.     The acts and omissions of each of the Defendants, described in this Complaint, including in paragraphs 63 through 64, demonstrate their failure to exercise the equivalent of slight care or a course of conduct which a reasonable and prudent person would know would probably result in harm or injury.

70.     Defendants owed to the Bank, its depositors, account holders, other creditors, and stockholders under Florida law the duty to act in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and

in a manner he reasonably believed to be in the best interests of the Bank; to ensure that the Bank's policies were followed and to take reasonably prudent steps to ensure that Century did not engage in imprudent business transactions as part of a plan to unreasonably grow the Bank or otherwise; and to exercise ordinary care and diligence in approving transactions and in the administration of the affairs of the Bank.

71.     In approving the ten Transactions on Exhibit A, each of which failed to comply with the internal credit policy and safe and sound banking practices, the Defendants each repeatedly abdicated his duties under Florida law and responsibilities to the Bank by failing to act with slight care, by unreasonably failing to investigate material facts, by not acting in good faith, by not acting in the best interest of the Bank, by approving transactions without being reasonably well informed, and without meaningful deliberation, and by ignoring the danger and risks the Transaction approvals were causing to the Bank.  In so doing, each Defendant exhibited such a lack of slight care or followed a course of conduct which a reasonable and prudent person would know would probably result in harm or injury.

72.     Defendants' actions and inaction described herein constitute gross negligence under Florida law.

73.     The Defendants also rejected or disregarded the prudent advice of third parties, such as regulators and auditors, designed to assist them in their decision-making with respect to the Bank's internal policies and practices.

74.     The Defendants were aware, or in the exercise of reasonable diligence should have been aware, of significant weaknesses in the Bank's underwriting practices and procedures, including with respect to the ten Transactions that are the subject of this action.

75.     The Defendants were also aware, or in the exercise of reasonable diligence should have been aware, of the deterioration of the Bank's asset portfolio caused by imprudent transactions, including the ten Transactions that are the subject of this action.

76.     The Defendants were also aware, or in the exercise of reasonable diligence should have been aware, of the negative impact on the Bank's earnings, liquidity and capital-to-asset ratio caused by high risk CRE/ADC transactions, including six of the ten Transactions that are the subject of this action.

77.     The Defendants were also aware, or in the exercise of reasonable diligence should have been aware, of the deficiencies in underwriting and support exhibited by the ten Transactions on Exhibit A, yet the Defendants approved the Transactions anyway.

78.     As a direct and proximate result of the Defendants' grossly negligent actions and omissions as described herein, the FDIC-R, as Receiver for Century, seeks damages caused thereby, the exact amount to be proven at trial.

79.     With respect to their grossly negligent actions and inactions in approving the ten Transactions, the Defendants were acting in cooperation and in concert and, therefore, each Defendant is jointly and severally liable for all compensatory and other damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation, as Receiver for Century Bank, Federal Savings Bank, demands a trial by jury and judgment in its favor against the Defendants as follows:

A.    For compensatory and other damages, against the Defendants at an amount to be proven at trial;

B.    For prejudgment interest pursuant to Florida law and 12 U.S.C. § 1821(l); and

C.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issue so triable.

**DATED**: November 9, 2012

Respectfully submitted,

Joseph G. Galardi
Florida Bar No. 180572
BEASELY HAUSER KRAMER
& GALARDI, P.A.
505 South Flagler Drive, Suite 1500
West Palm Beach, Florida 33401
Tel:  (561) 835-0900
Fax: (561) 835-0939
Email: galardi@beasleylaw.net
*Trial Attorneys for Plaintiff*